628 F.2d 36
 202 U.S.App.D.C. 36
 HOWARD SOBER, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Nationwide Auto Transporters, Inc., Aaacon Auto Transport,
Inc., Auto Driveaway Company, Intervenors.
 No. 78-1798.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 26, 1979.
Decided Jan. 25, 1980.
Rehearing Denied March 6, 1980.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 Richard A. Kerwin, Chicago, Ill., with whom Albert F. Beasley, Washington, D. C. and Robert G. Jorgensen, Chicago, Ill., were on brief, for petitioner.
 H. Glenn Scammel, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, and Kenneth G. Caplan, Deputy Associate Gen. Counsel, I. C. C., Washington, D. C., were on brief, for respondents.
 
 
 1
 Daniel B. Johnson, Washington, D. C., for intervenor Auto Driveaway Co.
 
 
 2
 Ronald N. Cobert, Robert L. Cope, Washington, D. C. and Harold G. Hernly, Jr., Alexandria, Va., were on brief, for intervenor Nationwide Auto Transporters, Inc.
 
 
 3
 Ralph J. Zola, New York City, was on brief, for intervenor Aaacon Auto Transport, Inc.
 
 
 4
 Robert D. Jones and David Popowski, Counsel, I. C. C., Washington, D. C., for respondent I. C. C.
 
 
 5
 Robert B. Nicholson and Ron M. Landsman, Attys., Dept. of Justice, Washington, D. C., for respondent United States of America.
 
 
 6
 Before J. EDWARD LUMBARD,* Senior Circuit Judge for the Second Circuit, and TAMM and MIKVA, Circuit Judges.
 
 
 7
 Opinion for the court filed by TAMM, Circuit Judge.
 
 TAMM, Circuit Judge:
 
 8
 This case arose because the Interstate Commerce Commission committed a clerical error. Howard Sober, Inc. (Sober), the petitioner here, seeks review of the Commission's order that corrected the error by restricting its certificate of public convenience and necessity to exclude secondary movements in driveaway service.[1] We agree with the Commission that it has the authority to rectify ministerial mistakes made in good faith and, therefore, we affirm.
 
 I.
 
 9
 The facts in this case are intricate and require considerable elaboration to place the legal issues in perspective. In 1971, Dealers Transit, Inc. (Dealers), a subsidiary of National City Lines, Inc. (NCL), applied to the Commission for permission to transfer to Nationwide Auto Transporters, Inc. (Nationwide) its right to transport automobiles in secondary driveaway movements.[2] The Commission approved the transfer but expressed concern over possible overlapping rights that might develop between Dealers and an affiliate; it therefore restricted the rights retained by Dealers as transferor to primary driveaway movements: "the operating rights . . . retained by the transferor and its affiliate (are) restricted to the movement of traffic to and from a point of manufacture or assembly . . . ." Nationwide Auto Transporters, Inc., No. MC-FC-72889, at 15 (I.C.C. Div. 3, Nov. 22, 1971) (amended May 11, 1972), reprinted in Joint Appendix (J.A.) at 206, 220. The Commission included this proviso so that Dealers and an affiliate would
 
 
 10
 not construe their certificate in such a manner as to perform the same type of service as is sought to be performed by Nationwide under the rights to be acquired . . . . (This) restriction, as a means of enforcing the separation of these (services), will insure that the "split sticks", thereby eliminating a potential source of overlapping operations in the future.
 
 
 11
 Id. at 14, reprinted in J.A. at 219.
 
 
 12
 While the transfer proceeding was pending, NCL, Dealers' parent company,[3] applied to the Commission for permission to purchase the stock of Sober, a common carrier with driveaway authority.[4] The purchase agreement, concluded on November 23, 1971, received the Commission's approval on April 12, 1972, subject to the condition that NCL would
 
 
 13
 within a period of six months . . . submit a plan for the elimination of duplications in the operating rights of Howard Sober, Inc., and other carriers under the control of National City Lines, Inc.; . . . jurisdiction shall be reserved by the Commission to reopen the proceeding at any time for the purpose of ordering an end to the duplication by cancellation, merger, or otherwise . . ..
 
 
 14
 National City Lines, Inc., No. MC-F-11413, at 5 (I.C.C. Rev. Bd. 5, Apr. 12, 1972), reprinted in J.A. at 236, 240. With this condition, NCL consummated its acquisition of Sober on May 2, 1972.[5]
 
 
 15
 Concerned by these Commission actions, Aaacon Auto Transport, Inc. (Aaacon), a competitor in driveaway service, filed a petition with the Commission asking it to reconsider its order permitting Dealers to sell its secondary driveaway authority to Nationwide. Aaacon asserted that NCL's purchase of Sober amounted to "trafficking in operating rights" that would permit NCL through a subsidiary to engage in the same secondary driveaway services that another subsidiary, Dealers, had sold for a profit. The Commission rejected Aaacon's petition but did amend its 1971 order approving the transfer from Dealers to Nationwide to provide that "the operating rights . . . retained by transferor and its affiliates to transport automobiles by driveaway (are) restricted to the movement of traffic to and from a point of manufacture or assembly . . .." Nationwide Auto Transporters, Inc., No. MC-FC-72889 (I.C.C. Div. 3, May 11, 1972) (order amending 1971 order) (emphasis added), reprinted in J.A. at 235. This modification prohibited all Dealers' affiliates from engaging in secondary driveaway movements involving automobiles. A three-judge district court subsequently approved the transfer. See Aaacon Auto Transport, Inc. v. United States, 345 F.Supp. 101 (S.D.N.Y.1972).
 
 
 16
 On December 20, 1972, the Commission issued Sober a new Certificate of Public Convenience and Necessity. The certificate generally described Sober's authority but nowhere mentioned the restriction imposed on Dealers and its affiliates. See J.A. at 32-38. No one objected to the certificate at the time.
 
 
 17
 In 1975 NCL sold the stock of Sober to Coltrans, Inc., a Michigan corporation owned by Norman Collins. Collins was an officer of Dealers and had served as president of Sober before the sale. The sale to Coltrans occurred without Commission review, for neither Coltrans nor Collins was a common carrier at the time of the transaction.
 
 
 18
 The scene now shifts to 1977. In that year, Sober filed a tariff with the Commission under which it would begin operating a secondary driveaway service. Aaacon asked the Commission to reopen the 1972 case involving Sober to make explicit on Sober's certificate the restriction excluding secondary driveaway service.[6] The Commission, in a notice served March 15, 1978, informed Sober that its certificate would be so restricted in accordance with the Commission's order of May 11, 1972. Howard Sober, Inc., No. MC-8989 (I.C.C., Mar. 15, 1978) (notice of amendments to certificate) (revised Mar. 28, 1978), reprinted in J.A. at 107.[7] Sober requested the full Commission to set aside the March 15 notice, but the Commission rejected its request. This petition for review followed.
 
 II.
 
 19
 Sober raises several issues before this court concerning the alteration of its certificate that restricted its secondary driveaway authority. Sober first asserts that the restriction initially imposed upon Dealers as transferor in the 1971 proceedings was unlawful. Second, Sober contends that it is not an "affiliate" of Dealers and therefore not subject to the transfer order that prevented Dealers' "affiliates" from operating in secondary driveaway movements. Third, Sober argues that even if it is an "affiliate" of Dealers, it was not a party to the transfer proceedings and thus cannot be bound by the restriction. Finally, Sober believes that the Commission was required to afford it notice and a hearing before amending its certificate in 1978 to conform with the restriction imposed on Dealers and its affiliates in 1972. We reject all these arguments.
 
 A.
 
 20
 Sober maintains that the regulations promulgated by the Commission to govern the transfer of operating rights,[8] especially 49 C.F.R. § 1132.5(d) (1978),[9] allow the imposition of restrictions only upon the transferee. This reading is unpersuasive. The regulations expressly require the denial of a transfer that would create "duplicating rights," that is, allowing two parties to carry passengers or the same commodity between the same two points. Id. § 1132.5(a)(1).[10] The Commission in 1971 imposed the initial restriction on Dealers, the transferor, to ensure that it would not engage thereafter in the type of operations secondary driveaway services that it was selling to Nationwide. The condition lawfully furthers the Commission's goal of preventing the duplication of rights, and Dealers, the transferor, accepted it as such in its agreement with Nationwide.
 
 B.
 
 21
 Sober's second contention that it is not an "affiliate" of Dealers is equally unavailing. The Commission issued the amending order on May 11, 1972. NCL's acquisition of Sober was complete on May 2, nine days earlier.[11] Thus, at the time the Commission issued its May 11 order, Dealers and Sober had the same corporate parent, NCL.
 
 
 22
 Sober points to 49 U.S.C. § 5(7) (1976) (current version at 49 U.S.C.A. § 11343(c) (West Spec. Pamph. 1979)), which defines an affiliate as an entity "managed in the interest of (the) other carrier," id.,[12] to argue that common corporate control does not alone establish affiliation. The definition in section 5, however, applies only to combinations and consolidations of carriers under that section and not to transfers of authority under 49 U.S.C. § 312(b) (1976) (current version of 49 U.S.C.A. § 10926 (West Spec. Pamph. 1979)), the provision applicable here. Commission regulations under section 312(b) view affiliation differently. Specifically, they described affiliation in terms of control: "The Commission will not approve a transfer of operating rights to a person who controls, or who is controlled by, or who is under common control with, another person who is the holder of operating rights which duplicate . . . those proposed to be transferred." 49 C.F.R. § 1132.5(d) (1978) (emphasis added). In this case, NCL's ownership of both Sober and Dealers establishes the requisite control to make the two subsidiaries affiliates.
 
 C.
 
 23
 Sober next argues that it is not bound by the Commission's May 11 order restricting secondary driveaway movements by Dealers' affiliates because it did not participate directly in that proceeding. As just discussed, however, Sober was an affiliate of Dealers when the Commission imposed the restriction by pluralizing "affiliate," and the Commission clearly had Sober in mind when it added this limitation.[13] NCL, as Dealers' parent company, participated in the Nationwide transfer proceedings and had notice of the restriction when it was originally imposed in the Commission's order of November 22, 1971. This notice gave it ample opportunity to protect the interests of subsidiaries such as Sober. We do not believe the Commission has to join all affiliated companies associated through an intricate network of parents and subsidiaries when it makes clear that an action is intended to bind the group and the affiliates are aware of this intent and can participate directly or through the parent. The notice to, and participation of, NCL in the Nationwide transfer proceeding binds Sober in the present case.[14]
 
 D.
 
 24
 Sober asserts the Commission could not change Sober's certificate once issued without first following the revocation procedures of notice and hearing required by 49 U.S.C. § 312(a) (1976) (current version at 49 U.S.C.A. § 10925 (West Spec. Pamph. 1979)). The Commission counters that a hearing is unnecessary; it simply placed on Sober's certificate a restriction it imposed on Sober, as an affiliate of Dealers, in 1972 but failed to include on the certificate due to a ministerial error. The Commission is correct.
 
 
 25
 In American Trucking Associations v. Frisco Transportation Co., 358 U.S. 133, 79 S.Ct. 170, 3 L.Ed.2d 172 (1958), the Supreme Court recognized the Commission's inherent power to rectify ministerial mistakes. The Commission in that case had approved the appellee's purchase of several motor carriers but had failed to include in the new certificates certain restrictions. The Court rejected an effort to set aside the correcting orders. Chief Justice Warren, writing for the majority, drew an analogy to the power of courts to correct mistakes:
 
 
 26
 It is axiomatic that courts have the power and the duty to correct judgments which contain clerical errors or judgments which have issued due to inadvertence or mistake. Gagnon v. United States, 193 U.S. 451 (24 S.Ct. 510, 48 L.Ed. 745). Rule 60(a) of the Federal Rules of Civil Procedure (28 U.S.C.A.), recognizes this power and specifically provides that "(c)lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders." A similar power is vested in the Interstate Commerce Commission. Section 17(3) of the Act creating the Commission, 49 U.S.C. § 17(3) ((1976) (current version at 49 U.S.C.A. § 10306 (West Spec. Pamph. 1979)), provides that: "The Commission shall conduct its proceedings under any provision of law in such manner as will best conduce to the proper dispatch of business and to the ends of justice." This broad enabling statute, in our opinion, authorizes the correction of inadvertent ministerial errors. To hold otherwise would be to say that once an error has occurred the Commission is powerless to take remedial steps. This would not, as Congress provided, "best conduce to the ends of justice." In fact, the presence of authority in administrative officers and tribunals to correct such errors has long been recognized probably so well recognized that little discussion has ensued in the reported cases. Bell v. Hearne, 19 How. 252 (15 L.Ed. 614).
 
 
 27
 Id. at 145, 79 S.Ct. at 177.
 
 
 28
 The Commission exercised its inherent power in this case to place clearly on Sober's certificate the restriction already imposed by its May 11, 1972 order to prevent Sober and other affiliates of Dealers from engaging in the secondary driveaway service that Dealers had sold to Nationwide. The Commission has not revoked any authority held by Sober; it instead has made more explicit the scope of the driveaway authority granted in 1972.[15] With no revocation at stake, a hearing need not be held,[16] for Sober and NCL had the opportunity to raise questions as to the extent of Sober's authority in the 1972 hearing. Requiring a hearing when this sort of mistake is made would waste the Commission's limited resources by forcing it to reconsider an action that was already decided but improperly executed. Allowing Sober to begin secondary driveaway movements in this case would permit the "overlapping operations" that the Commission earlier had sought to avoid. See Nationwide Auto Transporters, Inc., No. MC-FC-72889, at 14 (I.C.C. Div. 3, Nov. 22, 1971) (original order approving transfer to Nationwide), reprinted in J.A. at 206, 219.
 
 III.
 
 29
 To err is both human and inevitable in a large agency such as the Interstate Commerce Commission. The Commission in this case has acted to correct a ministerial error it committed in failing to include a restriction in Sober's certificate, a restriction imposed upon and accepted by the certified carrier's parent, NCL. That the error occurred is regrettable; that the Commission is now correcting it is laudable, and this court should not interfere. Therefore, the decision of the Commission is
 
 
 30
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976)
 
 
 [1]
 A carrier engages in driveaway service when it transports vehicles by actually driving them rather than carrying them by truck. Primary driveaway service involves the transportation of the vehicles from their place of manufacture. Secondary driveaway movements are any other driveaway service, e. g., taking a car from one locale to another for a finance company
 
 
 [2]
 The Commission processed the transfer pursuant to 49 C.F.R. pt. 1132 (1978) (Transfers of operating rights). Congress has empowered the Commission to adopt appropriate procedures governing these transfers. See 49 U.S.C. § 312(b) (1976) (current version at 49 U.S.C.A. § 10926 (West Spec. Pamph. 1979)). Congress in 1978 recodified the statutes governing the Commission and its authority. See Act of Oct. 17, 1978, Pub.L.No.95-473, § 1, 92 Stat. 1337 (codified at 49 U.S.C.A. §§ 10101-11916 (West Spec. Pamph. 1979)). Congress expressly stated that it meant to make no substantive changes. See id. § 3(a)
 
 
 [3]
 NCL owned all the stock of Automobiles Carriers, Inc., which, in turn, controlled both Dealers and its affiliate, C&J Commercial Driveaway, Inc
 
 
 [4]
 At the time of the application, mergers and consolidations were governed by 49 U.S.C. § 5 (1976) (current version at 49 U.S.C.A. § 11343 (West Spec. Pamph. 1979))
 
 
 [5]
 Sober contends that it did not become affiliated with Dealers until June 8, 1973, when the Commission issued its final order approving NCL's purchase of Sober. On May 2, 1972, however, NCL notified the Commission that the sale and purchase of Sober's stock "were consummated by the parties effective May 2, 1972 in accordance with the order of the Commission . . . served April 12, 1972." J.A. at 252
 
 
 [6]
 The Commission rejected a similar request by Nationwide. Howard Sober, Inc., No. MC-8989 (I.C.C. Div. 1, Nov. 17, 1977), reprinted in J.A. at 93
 
 
 [7]
 Subsequently, the Commission formally accepted Aaacon's petition to intervene but denied its request to reopen the proceedings because the March 15 notice had given Aaacon the relief it sought
 
 
 [8]
 See note 2 supra
 
 
 [9]
 This provision states in full:
 The Commission will not approve a transfer of operating rights to a person who controls, or who is controlled by, or who is under common control with, another person who is the holder of operating rights which duplicate, in whole or in part, except to an immaterial extent, those proposed to be transferred.
 
 
 [49]
 C.F.R. § 1132.5(d) (1978)
 
 
 [10]
 This provision states: "An application for transfer of part of an operating right as to routes or commodities will be denied if it is found that the petition (1) would create duplicating rights . . .." Id. § 1132.5(a). Cf. id. § 1132.1(c) (defining "duplicating rights" to be overlaps in carrying passengers or the same commodities between the same two points)
 
 
 [11]
 See note 5 supra
 
 
 [12]
 See note 4 supra
 
 
 [13]
 The May 11 order referring to "affiliates" mentioned the petition by Aaacon that protested the Commission's actions approving the transactions involving NCL, Dealers, and Sober. A correction issued before Aaacon's petition and the consummation of Sober's sale referred only to Dealers' "affiliate." Nationwide Auto Transporters, Inc., No. MC-FC-72889 (I.C.C. Div. 3, Mar. 29, 1972), reprinted in J.A. at 224
 
 
 [14]
 A three-judge district court considering this question reached the same conclusion: "Although Aaacon questioned the legal effectiveness of this condition on the affiliates, we think it clear that by applying for and making the transfer, Dealers bound itself to see that the condition is fulfilled as long as the affiliation continues." Aaacon Auto Transport, Inc. v. United States, 345 F.Supp. 101, 103 n.3 (S.D.N.Y.1972)
 The subsequent sale of Sober's stock to Coltrans, Inc., does not affect this analysis. Collins, the president of Coltrans, was president of Car Carriers, Inc., a subsidiary of Dealers, when the Commission imposed the May 11 restriction and was president of Sober itself when NCL completed its purchase of Sober. Thus, Coltrans had notice through its agent Collins of the restriction when it purchased Sober. This notice to Collins is binding on Coltrans. See W. Fletcher, 3 Cyclopedia of the Law of Private Corporations § 790, at 12-13 (rev. perm. ed. 1975). Accordingly, the sale of Sober's stock to Coltrans did not affect the restriction on Sober's secondary driveaway authority.
 
 
 [15]
 Indeed, the Commission in 1975 used this inherent authority to amend Sober's certificate to correct certain errors. J.A. at 37
 
 
 [16]
 Sober contends that a hearing is required in this case because the parties had one in Frisco. This argument, too, is without merit. The hearing in Frisco simply revealed that the Commission had issued unconditional certificates by mistake. Here, the error is apparent without the need for a hearing
 In Strickland Transp. Co. v. United States, 274 F.Supp. 921 (N.D.Tex.1967), aff'd, 389 U.S. 574, 88 S.Ct. 694, 19 L.Ed. 782 (1968), a three-judge district court held that the Commission need not hold hearings under 49 U.S.C. § 312(a) when correcting an order that it had mistakenly entered pursuant to a court decree. In this case, the Commission was correcting an error it made in implementing its own order of May 11, 1972.
 Sober's reliance on Eagle Motor Lines, Inc. v. United States, 545 F.2d 1015 (5th Cir. 1977), and Watson Bros. Transp. Co. v. United States, 132 F.Supp. 905 (D.Neb.1955), aff'd mem., 350 U.S. 927, 76 S.Ct. 302, 100 L.Ed. 810 (1956), is equally misplaced. These cases involved substantive changes in the authority granted the carriers; thus, hearings were required. In this case, no substantive change in authority occurred.